**No. 26-1541**

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE SEVENTH CIRCUIT

-------------------------

IN RE MOTORLA SOLUTIONS INC.

*RESPONDENT,*

-------------------------

On Petition for a Writ of Mandamus to the United States District
Court for the Northern District of Illinois

(Hon. John J. Tharp, Jr., Case No. 1:20-cr-688)

-------------------------

## SUPPLEMENTAL APPENDIX TO

## RESPONSE IN OPPOSITION TO PETITION FOR A WRIT OF
## MANDAMUS PURSUANT TO 18 U.S.C. § 3771(d)(3)

-------------------------

Boyd Cloern
Leah Quadrino
STEPTOE LLP
1330 Connecticut Avenue NW
Washington, DC 20036
(202) 429-3000

Rachel M. Cannon
(*Counsel of Record*)
Christopher S. Niewoehner
Brendan Hammond*
STEPTOE LLP
Suite 4700
227 W. Monroe Street
Chicago, IL 60606
312-557-1270
rcannon@steptoe.com

*Application for admission
forthcoming

*Counsel for Respondent Hytera
Communications Corporation Ltd.*

June 3, 2026

# TABLE OF CONTENTS

Hytera's Response to the Government's Sentencing Memorandum (Dkt. 399), dated Nov. 16, 2025 ..............................................................................SA1

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>Plaintiff,<br><br>v.<br><br>HYTERA COMMUNICATIONS CORPORATION LTD., et al.<br><br>Defendants. | Case No. 1:20-CR-00688<br><br>Honorable John J. Tharp Jr.<br><br>███████████████ |

**DEFENDANT HYTERA COMMUNICATIONS CORPORATION LTD.'S**
**RESPONSE TO THE GOVERNMENT'S SENTENCING MEMORANDUM**

**SA1**

# Table of Contents

I.    Introduction ........................................................................................................................... 1

II.    The Government Has Not Presented Any Evidence of Hytera's Participation in the 2008 Theft ...... 2

    A.    GS Kok Recruited Hytera, Not the Other Way Around ................................................. 2

    B.    Chen and GS Negotiated GS's Employment, Salary, and Benefits for Six Full Months ............... 4

    C.    GS Was in Over His Head Upon Arrival and Immediately Pushed to Hire His "Subject Matter Experts" .......................................................................................................................... 6

    D.    GS's Claims of Chen's Involvement are Wholly Uncorroborated ................................. 8

    E.    The Former Motorolans Actively Hid Their Theft from Hytera ................................... 13

    F.    Hytera Terminated GS, YT, and Sam Chia in 2018 for Failing to Cooperate in Hytera's Investigation of their Misconduct .................................................................................. 17

III.    The Government Avoids a Substantive Analysis of Motorola's Lost Profits, and Its Shortcut Leads to Error ......................................................................................................................... 19

    A.    Motorola Abandoned Malackowski's Lost-Profits Analysis During Trial, and The Seventh Circuit Concluded It Was Error for Judge Norgle to Determine Lost Profits ..................................... 20

    B.    The Government Has Failed to Define the Trade Secrets at Issue in the Criminal Case ............. 22

    C.    Any Findings From the Civil Case Were Made Under a Preponderance-of-the-Evidence Standard, Which Does Not Apply Here .......................................................................... 23

    D.    Malackowski's Lost-Profits Analysis Is Substantively Flawed .................................... 23

        1.    Malackowski's Market-Share Approach Is Not Appropriate for this Case ............................ 23

        2.    Malackowski's Market-Share Analysis Is Based on Unfounded Assumptions and Cannot Establish Lost Profits Here .......................................................................................... 25

        3.    Malackowski's Analysis Is Filled With Basic Errors ............................................. 28

IV.    The Government's Remaining Guidelines Calculations are Incorrect ..................................... 28

    A.    No Evidence Supports the Government's Requested Enhancement Under U.S.S.G. § 2B1.1(b)(14) ............................................................................................................. 28

    B.    The Proper Guidelines Offense Level Is 12, Producing a Guidelines Fine Range of $98,000 to $196,000 ...................................................................................................................... 29

V.    The Government's Analysis Regarding Restitution Is Incorrect ............................................. 30

    A.    The Complexity Exception to the MVRA Applies Here .............................................. 30

    B.    The MVRA Does Not Permit Recovery of Lost Profits as Restitution for Property Offenses .... 31

    C.    *Apprendi* Requires That Restitution Fact-Finding Be Conducted Using a Reasonable Doubt Standard ...................................................................................................................... 33

    D.    Motorola's Request for Attorney's Fees Exceeds the Bounds of Restitution Under the MVRA. 34

VI.    Hytera Agrees With Probation's Suggested Conditions of Probation ....................................... 35

    A.    Proposed Mandatory and Standard Conditions ........................................................... 35

**SA2**

B.   Proposed Special Conditions .................................................................... 36

    1.   Proposed Conditions Relating to Hytera's Compliance Program............................................ 36

    2.   Proposed Condition Requiring Publication of Hytera's Crime ................................................ 37

    3.   Proposed Condition Regarding Hytera's Asset Sales............................................................ 39

    4.   Proposed Condition Relating to Priority of Payment ............................................................ 39

    5.   Proposed Condition to Comply with Civil Case Orders........................................................ 40

VII.   Hytera Has Proposed an ███ Million Per Year Payment Plan And Cannot Pay More ................ 41

**SA3**

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Apprendi v. New Jersey*,
    530 U.S. 466 (2000)................................................................................................23

*BIC Leisure Prods., Inc. v. Windsurfing Int'l, Inc.*,
    1 F.3d 1214 (Fed. Cir. 1993)................................................................................24, 27

*Crawford v. Washington*,
    541 U.S. 36 (2004)................................................................................................13

*Ellingburg v. United States*,
    No. 25-482 (U.S. June 23, 2025) ..........................................................................23

*Euroholdings Cap. & Inv. Corp. v. Harris Tr. & Sav. Bank*,
    602 F. Supp. 2d 928 (N.D. Ill. 2009) ...................................................................22

Grain Processing Corp. v. Am. Maize-Prods. Co., 185 F.3d 1341,  1350 (Fed. Cir. 1999)..........27

*Guenther v. Holmgreen*,
    738 F.2d 879 (7th Cir. 1984) ................................................................................23

*Hunter Bldgs. & Mfg., L.P. v. MBI Glob.*,
    L.L.C., 436 S.W.3d 9 (Tex. App. 2014) ...............................................................22

*Hytera Commc'ns Corp. Ltd. v. Motorola Sols., Inc.*,
    623 F. Supp. 3d 857 (N.D. Ill. 2022) ...........................................................12, 16, 29

*Kaufman Co. v. Lantech, Inc.*,
    926 F.2d 1136 (Fed. Cir. 1991)..............................................................................24

*L.P. v. PacifiCorp*,
    479 F.3d 1199 (10th Cir. 2007) .............................................................................21

*Lagos v. United States*,
    584 U.S. 577 (2018).............................................................................. *passim*

*Mangren Rsch. & Dev. Corp. v. Nat'l Chem. Co.*,
    87 F.3d 937 (7th Cir. 1996) ...................................................................................22

*Motorola Sols., Inc. v. Hytera Commc'ns Corp.*,
    108 F.4th 458 (7th Cir. 2024) ...................................................................20, 21, 42

*Motorola Sols., Inc. v. Hytera Commc'ns Corp.*,
    No. 24-1531 (7th Cir. Apr. 16, 2024), ECF No. 24 .......................................39, 40

**SA4**

*Panduit Corp. v. Stahlin Bros. Fibre Works*,
   575 F.2d 1152, 197 USPQ 726 (6th Cir.1978) ........................................24

*Price v. Marshall Erdman & Assocs., Inc.*,
   966 F.2d 320 (7th Cir. 1992) ...............................................................21

*S. Union Co. v. United States*,
   567 U.S. 343 (2012)...............................................................................23

*Smith v. Doe*,
   538 U.S. 84 (2003)..................................................................................33

*State Industries, Inc. v. Mor-Flo Industries, Inc.*,
   883 F.2d 1573 (Fed. Cir. 1989)..............................................................23

*TAS Distrib. Co., Inc. v. Cummins Engine Co.*,
   Inc., 491 F.3d 625, 633 (7th Cir. 2007....................................................22

*United States v. Andersen*,
   45 F.3d 217 (7th Cir. 1995) ....................................................................29

*United States v. Beydoun*,
   469 F.3d 102 (5th Cir. 2006) ..................................................................33

*United States v. Jones*,
   616 F. App'x 726 (5th Cir. 2015) ............................................................33

*United States v. LaGrou Distribution Sys., Inc.*,
   466 F.3d 585 (7th Cir. 2006) ..................................................................33

*United States v. Malone*,
   747 F.3d 481 (7th Cir. 2014) ..................................................................30

*United States v. Milstein*,
   481 F.3d 132 (2d Cir. 2007)...............................................................32, 33

*United States v. Mitchell*,
   876 F.2d 1178 (5th Cir. 1989) ................................................................32

*United States v. Scott*,
   405 F.3d 615 (7th Cir. 2005) ..................................................................33

*United States v. Yu*,
   719 F. Supp. 3d 165 (D. Mass. 2024) .................................................33, 34

**Statutes**

18 U.S.C. § 1832.......................................................................................29, 30

iv

**SA5**

18 U.S.C. § 1839.................................................................................................................32

18 U.S.C. § 3553...........................................................................................................35, 36

18 U.S.C. § 3563....................................................................................................35, 36, 40

18 U.S.C. § 3663A...................................................................................................30, 31, 32

18 U.S.C. § 3664A................................................................................................................32

U.S.S.G. § 2B1.1(a)(2).........................................................................................................29

U.S.S.G. § 2B1.1(b)(1) ...................................................................................................29, 30

U.S.S.G. § 2B1.1(b)(10)(B)..................................................................................................29

U.S.S.G. § 2B1.1(b)(14) ................................................................................................28, 29

U.S.S.G. § 8C2.2..................................................................................................................40

U.S.S.G. § 8C2.4(d)..............................................................................................................30

U.S.S.G. § 8C2.6..................................................................................................................30

U.S.S.G. § 8C3.3..................................................................................................................40

U.S.S.G. § 8D1.3(c)..............................................................................................................36

**Other Authorities**

China Secs. J., www.cs.com.cn/ (last visited Nov. 16, 2025)........................................................37

Chinese Telecommunications Company Pleads Guilty to Conspiracy to Steal Technology
    from Illinois-Based Motorola Solutions, DEP'T OF JUST. (Jan. 14, 2025),
    www.justice.gov/usao-ndil/pr/chinese-telecommunications-company-pleads-guilty-
    conspiring-steal-technology-illinois ........................................................................................38

Federal Indictment Charges PRC-Based Telecommunications Company with Conspiring
    with Former Motorola Solutions Employees to Steal Technology, DEP'T OF JUST.
    (Feb. 7, 2022), www.justice.gov/archives/opa/pr/federal-indictment-charges-prc-
    based-telecommunications-company-conspiring-former-motorola;........................................38

Secs. Daily, www.zqrb.cn/ (last visited Nov. 16, 2025)................................................................37

Secs. Times, www.stcn.com/ (last visited Nov. 16, 2025) ............................................................37

Shanghai Secs. News, www.cnstock.com/ (last visited Nov. 16, 2025)........................................37

Shenzhen Stock Exch., www.szse.cn/index/index.html?from=timeline (last visited Nov. 16, 2025) ...................................................................................................................37

*Use Motorola Solutions' Stolen Trade Secrets*, MOTOROLA SOLS. (Sept. 2, 2025), www.motorolasolutions.com/newsroom/press-releases/hytera-continues-to-use-stolen-trade-secrets.html ...................................................................................................38

## I.     Introduction

A disgruntled Motorola employee and his minions committed an IP theft nearly twenty years ago in Malaysia. A trail of abundant written evidence makes this clear. Both Motorola and the government have sought to recast these events as geopolitical and commercial acts of war lodged by a Chinese company and its then-CEO, but no evidence supports that narrative.

Likewise, no evidence supports the ask for $290 million in lost profits restitution. The case is missing evidence about any specific trade secrets that were stolen, any specific trade secrets that Hytera actually *used*, and any sales that Motorola lost as a result of Hytera's purported theft. Instead, the government simply gestures to the civil case and asks this Court to rely on unrelated findings and conclusions, including those the Seventh Circuit determined were made in error.

All the while, Hytera has paid Motorola more than ▮▮▮ million in compensatory damages, interest, and royalties on the accused products from trial. It respectfully asks this Court to allow it to pay Motorola an additional ▮▮ million annually over the next five years, as part of a payment plan, until its remaining obligations are fulfilled. In the end, Motorola will reap many millions more than the $174 million it claims in lost profits courtesy of the $271.6 million punitive damages award. And that $271.6 million punitive damages award is part of more than $600 million in damages, interest, costs, fees, and royalties that Hytera will pay in total to Motorola as a result of the civil litigation.

Hytera agrees that the ex-Motorolans should never have stolen Motorola's code and documents nearly 20 years ago in Malaysia. Hytera has been paying for their mistakes ever since—legally, financially, and in the court of public opinion. It will more than make Motorola whole, and Motorola has and will profit handsomely from its global litigation campaign. Hytera has also worked hard to develop a world-class compliance program to ensure this mistake will never happen again.

But the law does not allow Hytera to be fined out of business, nor ordered to pay restitution based on sweeping but specious claims untethered to the facts or the MVRA. Hytera looks forward to putting

this matter behind it and respectfully asks this Court to show it a measure of justice and fairness—two things that even a Chinese company accused of stealing from an iconic American competitor is entitled to under the Constitution.

## II.     The Government Has Not Presented Any Evidence of Hytera's Participation in the 2008 Theft

The government devotes nearly half of its 47-page Sentencing Memorandum to recounting a version of events that bears only a limited relationship to the actual facts of this case. The government's tale of a sweeping and egregious conspiracy in which Hytera leadership led the charge is not supported by any evidence, and must be corrected here.

### A.     GS Kok Recruited Hytera, Not the Other Way Around

The government claims Hytera orchestrated the theft by convincing GS Kok and the other indicted ex-Motorolans to steal from their employer and bring the results of their purported pillaging to Hytera.[1] But the evidence shows the opposite—it was GS Kok who aggressively recruited Hytera and tried to create a false sense of urgency about purported FCC regulatory changes to encourage Hytera to quickly hire him.[2]

As GS acknowledged to the grand jury, he wanted out of Motorola: "I was interested in a position at Hytera because I did not feel that my contributions to Motorola were being properly recognized by Motorola, and I felt that I was not being paid enough by Motorola."[3] GS described this period of his Motorola employment as the "low time" of his career.[4]

The ensuing correspondence between GS and Chen makes clear that GS decided to target Hytera

---

[1] Gov. Sent. Mem. at 3.

[2] *See* Def. Ver. at 14.

[3] Gov. Ver., Ex. C.

[4] Def. Ver. at 14 n.72, Ex. 49. Key exhibits from the Hytera's Version of the Offense cited herein are collected for the Court's convenient reference at Dkt. 379. References to Ex. R-# are to a second group of exhibits filed with this brief at Dkt. 380.

as his next employer—not the other way around. GS affirmatively sought out Hytera's CEO, Mr. Chen, on a trip to Shenzhen, China after previously meeting him at an industry conference in Las Vegas.[5] GS then began selling himself to Chen over email, bragging about his purported accomplishments and urging that Hytera should hire him without delay to develop a DMR radio or the Company would fall behind fast.[6]

For example, on June 27, 2007, GS emailed Chen that the "FCC is now [making] it mandatory for 6.25 kHz channel spacing" and catastrophized that "sales of 25 kHz channel spacing equiopments [*sic*] will cease in 2013!!"[7] GS wrote that "[t]ime is ticking fast" and estimated that "it will take us at least 2 years with the right team to develop a portable and mobile platform."[8] GS urged, "I'm afraid if HYT don't jump on the band wagon you will be left far behind."[9] GS proposed that Hytera open an R&D center in Penang, Malaysia with GS (and his team) at the helm.[10]

This self-promoting puff-piece is the sole evidence on which both Dr. Wicker and the government rely to support their argument that Hytera was facing "regulatory headwinds." As explained in Hytera's opening brief, GS's claims about the FCC mandating 6.25kHz channel spacing were not true, and Hytera's analog radios already had 12.5kHz capability (meaning, Hytera needed only to *remove* the 25kHz capability from its radios in order to comply—not develop something new).[11]

Hytera did not bite. In response to GS's proposal, Chen explained that he was still thinking about the risks associated with setting up an R&D center in Penang, including the potential for "commercial conflict with Motorola," which Chen wanted to avoid.[12] Attempting to "press things forward" and "move

---

[5] Def. Ver. at 14 n.73, Ex. 50.
[6] *Id.* at 14 n.74–78, Ex. 51.
[7] *Id.* at 14 n.75, Ex. 51.
[8] *Id.* at 14 n.76, Ex. 51.
[9] *Id.* at 14 n.77, Ex. 51.
[10] *Id.* at 15 n.78, Ex. 51.
[11] Hytera Sent. Mem. at 5; *see also* Def. Ver. at 11–15; Grimmett Rpt. at 21–24, Dkt. 365-1.
[12] Def. Ver. at 15 n.80, Ex. 52.

fast," GS continued to try to "get in contact with" Chen over the next several months, including by pestering Chen's secretary for his cell phone number and complaining about the "hot and cold feeling" he was getting from Hytera.[13] When GS eventually heard from Chen's secretary that Chen would be travelling to Penang in September 2007, GS reached out again to pressure Chen to hire him and clarify what GS's "Role and mission in HYT" would be.[14]

At the same time that GS was selling himself to Hytera, Hytera was determining how to move its DMR development to the next phase. Meeting minutes from August 2007 show that the Company's third-party consultant recommended that Hytera begin DMR productization since Hytera was ready to turn its existing working DMR radio project into a commercially viable product.[15] The consultant advised Hytera to hire a full-time project manager to lead that effort, and further recommended that the project manager be given considerable discretion to achieve productization.[16] In response to the outside consultant's advice to hire a DMR project manager, Chen eventually replied to GS's inquiries.[17]

**B.     Chen and GS Negotiated GS's Employment, Salary, and Benefits for Six Full Months**

What followed next was an arms-length, six-month negotiation between GS and Chen. By the end, Chen had rejected *every single one* of GS's September 2007 compensation demands, including those related to salary, stock options, moving expenses, and educational stipends for GS's children.[18] Chen also made clear that he was willing to walk away—even telling GS in October 2007 "no matter what kind of decision you make, I would respect your choice."[19] The months-long bartering between Chen and GS belies the government's unsupported assertion that Chen recruited GS to an urgent conspiracy to steal the

---

[13] Def. Ver. at 15 n.81–82, Exs. 53–54.
[14] *Id.* at 15 n.83, Ex. 55.
[15] *Id.* at 15 n.84, Ex. 56.
[16] *Id.* at 15 n.85, Ex. 56.
[17] *Id.* at 15 n.86, Ex. 57.
[18] *Id.* at 16–17 n.90–100, Exs. 58–68.
[19] *Id.* at 17 n.101, Ex. 62.

IP of a global competitor.

The email correspondence also shows that it was GS, and later YT Kok[20] (rather than Chen), who pushed to hire the former Motorolans and negotiated their salary packages. That is unsurprising, as GS and YT would have better understood what it took to encourage their former colleagues to leave their good jobs in Penang and move to a foreign country where most did not even speak the language. As Sam Chia explained to GS, he had "3 kids and being away for 2 years is going to really hurt the relationship I have with my family."[21]

Although the government suggests Hytera lured the Motorolans to China with excessively high salaries, it wholly ignores the relevant markets at the time. The local purchasing power index in Shenzhen was half of the purchasing power index in Penang[22]—meaning that engineers moving from Penang to Shenzhen would need increased salaries just to maintain the same quality of life. Thus, it was perfectly natural that some of the Shenzhen salaries were nearly twice as much as their Penang counterparts to compensate for those differences.

Economic data also makes clear that in 2007, wages in Shenzhen were rapidly rising due to a labor shortage, particularly in the manufacturing sector.[23] China quickly became "the best place for expats looking to make their money go further, with 76% of expats in the country experiencing growth in their spending power once they've moved."[24] Candidates for expat jobs were "especially in demand" for sectors including "manufacturing and industry."[25] Those "coming to China for an engineering job [were] being hired for a technical specialism" consistent with why Hytera hired G.S. and his "subject matter experts," and could "expect to make a salary at least on par with the US—if not more—plus an expatriate

---

[20] Def. Ver. at 19 n.119, Ex. 80.
[21] *Id.* at 19 n.120, Ex. 81.
[22] *Id.* at 19–20 n.131, Ex. 88.
[23] *Id.* at 20 n.123, Ex. 84.
[24] *Id.* at 20 n.124, Ex. 82.
[25] *Id.* at 20 n.125, Ex. 82.

package."[26] Indeed, expats were routinely paid "several times [] that of locals holding similar positions," which resulted in a "compensation disparity" designed to true up the hardship of having to leave families behind or relocate families to China.[27] Even today, expat "Engineering Professionals" in China make nearly double or triple what their local counterparts make.[28]

### C.     GS Was in Over His Head Upon Arrival and Immediately Pushed to Hire His "Subject Matter Experts"

The government also seems not to have analyzed how and why GS directed his co-defendants to steal Motorola's code and documents. Abundant evidence makes clear that it was because neither GS, nor the eventual team he brought with him, was capable of developing DMR at Hytera without Motorola's playbook in hand, because they were unfamiliar with the technology Hytera had elected to use.

The day after GS finally accepted Chen's employment terms, GS immediately pushed for "quick approval" of his recruited "experts" (i.e., the former Motorolans).[29] Unbeknownst to Hytera, that recruitment was critical to GS, for while he had presented himself as ready to lead Hytera's DMR development, GS lacked the requisite technical background. He was a hardware engineer—and the work Hytera hired him to manage was predominantly software development. Indeed, in his proffers to the government, GS explained he had to immediately build a team of software engineers to help him or risk being exposed as a fraud.[30]

Concerningly for GS, he initially failed to convince Chen to hire his team. In early December 2007, GS emailed Chen about the "few experts" he wished to bring over stating, "I understand you want to talk to them one at a time, but before I can even bring them to talk to you there must be a pull factor."[31]

---

[26] Def. Ver. at 20 n.126-127, Ex. 83.

[27] *Id.* at 20 n.128, Ex. 86.

[28] *Id.* at 20 n.129, Ex. 88.

[29] *Id.* at 17 n.102, Ex. 69.

[30] *Id.* at 17; *see* Def. Ver. Ex. 49 at 7–9 (G.S. describing his recruitment of the former Motorolan engineers for their specialties and access to Motorola's data); *see also* Def. Ver. Ex. 74.

[31] *Id.* at 17 n.104, Ex. 69.

Receiving no response, GS followed up again later that month providing descriptions of three specific candidates and stating to Chen, "I need you to respon[d] before I can approach them."[32] But again, no response from Hytera, who had already developed DMR circuitry that worked, and had a talented engineering force at its disposal. It did not need the "experts" GS was selling and had been in the market solely for a project manager.

Notwithstanding that Hytera was not responding to his requests to bring a team, and behind Hytera's back, GS began reaching out to his former colleagues at Motorola to try and convince them to join him at Hytera. He did so not because anyone at Hytera asked him to, but because he could not have delivered on his promises to Chen without their help. Indeed, GS was so desperate to build his team that he personally contacted between 20 and 30 engineers at Motorola asking if they would like to leave Motorola and join him.[33]

Once it became clear to GS that Hytera was ignoring his requests to bring a team of engineers from Motorola with him, GS again tried to foment a sense of panic in Chen—this time by heavily criticizing the current state of Hytera's DMR technology.[34] GS hyperbolically claimed to be "shocked" to find a large radio part count and "surprised" that Hytera had nothing that GS would consider to be a prototype radio after working on DMR technology for three years.[35] GS positioned himself as Hytera's savior and proposed a solution - in a March 10, 2008 email, GS claimed he had "identified 5 candidates and all are waiting for you to give the Green lights and they can be here with one month notice!"[36]

While GS was begging Hytera to allow him to bring a team from Motorola, he was simultaneously telling engineers at Motorola that he had already lined up jobs for them at Hytera.[37] For example, on

---

[32] Def. Ver. at 17 n.105, Ex. 71.

[33] *Id.* at 17–18 n.106, Ex. 72.

[34] *Id.* at 18 n.110, Ex. 74.

[35] *Id.* at 18 n.110, Ex. 74.

[36] *Id.* at 18 n.112, Ex. 75.

[37] *Id.* Ex. 68 at 4.

February 21, 2008, Sam Chia asked GS if it would be possible to visit Hytera before agreeing to join the company because this was "a big decision" for him.[38] GS responded that he was trying to arrange a "look see trip" for the engineers, emailing them as a group on February 25 that he had "verbal agreement" for the trip but was "working on final confirmation."[39] But, the very next day, February 26, GS sent the first of his two emails to Chen in which he expressed the need to hire "subject matter experts" as soon as possible.[40]

The "look see trip" eventually took place in early March 2008, during which Hytera's head of R&D, Dr. Sun, and COO, Dr. Tang, extensively interviewed the Motorola engineers for potential positions with the company, trying to ensure that they were technically strong candidates on their own merit.[41] None of that would have mattered if Hytera had simply planned to copy and use Motorola's materials. The first wave of former Motorolans eventually joined Hytera six months later, in June 2008.

### D.    GS's Claims of Chen's Involvement are Wholly Uncorroborated

As the government's Memorandum painstakingly describes, before arriving at Hytera, GS Kok's co-defendants downloaded copious amounts of Motorola code and documents. But nowhere in the thousands of personal emails in which they routinely and explicitly detail their copying, or in the millions of pages of discovery produced in the civil litigation, do the indicted individuals implicate Chen or anyone else within Hytera's leadership.[42] Moreover, the tone and demeanor of GS's communications with Chen (conducted over work email accounts) are starkly different from his communications with his co-conspirators (conducted over personal email accounts). And while GS and the other former Motorolans were prolific communicators over their personal email, detailing their theft every step of the way, **they**

---

[38] Def. Ver. at 18–19 n.113, Ex. 77.
[39] *Id.* at 19 n.114, Ex. 77.
[40] *See id.*, Ex. 74.
[41] *Id.* at 19 n.115, Ex. 2F; *see also* Ex. R-1, PTX-422.
[42] *See id.* at 22 n.143.

8
**SA15**

**did not include Chen in any of those discussions**.

For example, after GS's hiring, and within days of GS's emails to Chen about his "urgent need" to recruit additional "subject matter experts" to assist him, GS exchanged numerous emails on his personal account with Sam Chia and YT Kok about the materials he needed them to download from Motorola.[43] Chia reported back that he and YT "have been working very hard in backing up all the information. We are trying to grab whatever we can. We will surely need some of them when we are there."[44] None of those efforts are described anywhere in GS's correspondence with Chen.

Even the materials cited by the government in their sentencing memorandum make clear that the indicted individuals stole documents and code to use as a reference tool when developing DMR technology for Hytera—not at the request of Chen. *See, e.g.*, Gov. Sent. Mem. at 13, Dkt. 363 (quoting a Gtalk chat between co-defendants YT Kok and Phaik Ee Ooi where YT explains "we keep the source code for our own references"); *see also* Sam Chia proffer dated November 3, 2022:

> The decision to engage in "blanket copying" may have also originated at a dinner in approximately December 2007 between G.S., Y.T., and CHIA at the Park Royal hotel in Penang, Malaysia. At this dinner, G.S., Y.T., and CHIA discussed "backing up" MSI files as a form of insurance; the intention was to use MSI's information if CHIA or Y.T. encountered any R&D issues at HYTERA.[45]

In contrast to the extensive written record of GS's recruitment of his co-defendants and their discussions around the theft of Motorola's information, the government's supposed evidence of Chen's involvement rests exclusively on the uncorroborated word of GS Kok. But his word is worthless.[46] In 2017, GS testified under oath that neither Chen nor anyone else at Hytera asked him to steal Motorola's documents and code.[47] Now, in need of a reduced sentence, GS claims he previously lied under oath.

---

[43] Def. Ver. at 22 n.144, Ex. 94.
[44] *Id.* at 22 n.144, Ex. 94.
[45] *Id.* at 22–23 n.145, Ex. 183.
[46] *See id.* at 21.
[47] *Id.* at 21 n.132, Ex. 89.

GS's inability to keep his story straight is on full display throughout his government interviews. For example, during his first proffer, GS told the government that in February 2008, when he accepted employment with Hytera, he had no knowledge of Chen's purported plan to steal from Motorola—only that it "occurred to him that it might be headed in that direction."[48] By the end of his proffer sessions, GS began claiming that Chen explicitly instructed him to steal Motorola's source code months earlier, back in 2007, when the two had dinner in Penang.[49] Similarly, in another interview with the government, GS claimed that "Chen did not request details regarding what was being stolen by [Motorola] employees, but was clear that as long as the information was DMR-related," they should take it.[50] Five months later, GS changed his story and claimed that Chen explicitly "instructed KOK that he wanted [Motorola's] source code for all of [Motorola's] existing products[.]"[51]

In addition to being internally inconsistent, GS's claims are tangled up in factual impossibilities. For example, in his grand jury statement, which prosecutors drafted for him following months of unhelpful proffer sessions,[52] GS claimed that he met with Chen on a "near-daily basis" upon joining Hytera, and that Chen instructed him to steal the source code.[53] Not only is there no record of those meetings in Chen's calendars or elsewhere, but GS and Chen did not speak the same language. GS did not speak Mandarin, which Chen spoke, and GS has admitted that he could not understand Chen at all.[54] To communicate, GS wrote Chen emails in English, which Chen's secretary translated into Mandarin, because Chen did not

---

[48] Def. Ver. at 21 n.133, Ex. 49.

[49] Gov. Ver. at 4.

[50] Def. Ver. at 21 n.135, Ex. 73.

[51] *Id.* at 21 n.136, Ex. 68.

[52] G.S. Kok Grand Jury Statement at 1 ("The government prepared this statement after discussions with me.").

[53] *Id.* at 11.

[54] *Compare* G.S. Kok Grand Jury Statement at 5 ("When I spoke with Chen, we usually spoke Hokkien, a Chinese dialect, as it was the language we shared.") *with* FBIMAIN 008-000020-8 ("Communicating with CHEN throughout the evening was difficult because of the language barrier between G.S. and CHEN. Specifically, G.S. and CHEN could have simple conversations in Hokkien, but their Hokkien vocabulary as it related to business terms was limited."). *See also* Def. Ver. at 21 n.137, Ex. 90.

speak English.[55] These language barriers make it unlikely the two held daily meetings to discuss complicated topics like source code features.

The government attempts to corroborate "G.S.'s position on Chen's culpability" only by citing to speculative musings in proffers from two other indicted ex-Motorolans, YT Kok and Sam Chia.[56] Those proffers actually confirm the unreliability of the government's factual assertions. For example, YT Kok— the only one of the former Motorolans who spoke Mandarin—said that during an onboarding meeting, he asked Chen whether it was permissible to "reuse" Motorola information to meet Chen's desired timetable for development of a DMR radio.[57] YT claims that Chen did not acknowledge the question and responded with "something to the effect of 'I don't care. I want to achieve the time to market. Do whatever you want.'"[58] But in a situation where Chen did not know that YT Kok and others had stolen Motorola's code and documents, the question and response are innocent. The former Motorolans had lots of DMR-related expertise and experience in their heads, learned during their time at Motorola, that they could legitimately reuse at Hytera without committing any crime at all. Indeed, absent an employee signing an enforceable agreement not to work for a competitor (i.e., a "non-compete agreement"), it is settled law that employees can leave a company and join a competitor and use knowledge learned from their prior employer.[59] Tellingly, YT did not claim in the proffer that Chen had indicated he was aware the former Motorolans possessed stolen material. And of course, Chen could not have done that—the indicted defendants kept that material hidden from Hytera employees.[60] YT's unilateral "understanding" of Chen's remarks was based on facts known only to YT, and does not show that Chen was complicit in, or even aware of, the former Motorolans' scheme.

---

[55] *See, e.g.*, Def. Ver. at 21 n.138, Ex. 67.
[56] *See* Gov. Sent. Mem. at 5, Dkt. 363.
[57] Gov. Ver. 30–31.
[58] Gov. Sent. Mem. at 5 (quoting Exhibit D to Gov. Ver.).
[59] Def. Ver. at 22.
[60] *See* Def. Ver. at 22–23.

Sam Chia's proffer does even less to corroborate G.S. Kok's claims. First, Chia told the government his "impression" that the former Motorolans were supposed to use materials stolen from Motorola was based on "*conversations with G.S.*" where G.S. conveyed Chen's supposed directives, not anything that Chen himself actually did or said.[61] Even more troubling, Chia claimed to base that "impression" on meetings he attended in which he would provide a technical update to GS, and GS would supposedly translate that update into Mandarin for Chen, because Chia did not speak Mandarin.[62] *But neither did GS*.[63] YT Kok has previously testified under oath that he was the only member of the Malaysian team who spoke Mandarin.[64] Chia further explained that since he "could not understand the content of G.S. and CHEN's conversations" due to language issues, he "would sometimes 'zone out' while they were speaking."[65]

The government also points to a remark that Chen allegedly made to Chia in 2014 about being surprised that Motorola had not sued Hytera yet, which Chia supposedly took to mean "that CHEN knew MSI's information was being used to develop HYTERA's products, otherwise there would be no reason for MSI to sue HYTERA."[66] But technology companies frequently sue their competitors for patent infringement based on allegations of "copying," and Motorola itself began asserting patent claims against Hytera in 2017. *See Hytera Commc'ns Corp. Ltd. v. Motorola Sols., Inc*., 623 F. Supp. 3d 857, 869 (N.D. Ill. 2022) (discussing patent litigation before the ITC and mentioning other patent litigation in Germany).

The government also points to an email Chia sent to Chen in May 2017, after Motorola had sued Hytera, in which Chia notes that he and the former Motorolans had not "aligned their story."[67] But at this

---

[61] Gov. Sent. Mem. at 6–7 (emphasis omitted) (quoting Exhibit D to Gov. Ver.).
[62] Def. Ver. at 21; *see also* Gov. Ver. at 32 (quoting Ex. D (Sam Chia's proffer)).
[63] *See, e.g.,* Def. Ver. at 21 n.138, Ex. 67.
[64] Def. Ver. at 21 n.140, Ex. 91.
[65] Gov. Sent. Mem. at 6 (quoting Exhibit D to Gov. Ver.).
[66] Gov. Sent. Mem. at 7 (quoting Exhibit D to Gov. Ver.).
[67] Gov. Sent. Mem. at 18, Gov Ver. Ex. NN.

point, the theft had come to light, and Chia was speaking to Chen about *his own* misdeeds and fears. Even more, the correspondence plainly states that the former Motorolans had *not* aligned their stories, nor, to Chia's disappointment, had the Company provided them any "guidance" on how to do so. In other words, this email is consistent with Hytera not concealing anything at all.

The government also points to Chia's proffered account of a meeting that purportedly took place between himself and Chen shortly after Chia's May 2017 email.[68] But even if Chia's account of the meeting were taken at face value (and it should not be, since Chia's statements were made in an effort to secure a deal with the government), Chen's purported statements during that meeting do not support a claim that he helped orchestrate the underlying conspiracy, or that he knew about it *before* the lawsuit was filed. The statements also do not support an effort to cover anything up. Advising an employee who has been accused of criminal conduct to demonstrate a "sense of defense" is consistent with how any attorney would advise a client in litigation.

At bottom, the indicted defendants' self-serving, uncorroborated, ever-changing, and unverifiable accounts of purported conversations with or about Chen should be seen for exactly what they are: evidence-free morsels designed to secure cooperation credit. *Cf. Crawford v. Washington*, 541 U.S. 36, 44 (2004) (describing judicial skepticism of cooperator testimony). Because there is nobody else "up the food chain" at Hytera that the indicted individuals can testify against, they have been led by their nose to do so against Chen.

### E.    The Former Motorolans Actively Hid Their Theft from Hytera

The government hints that knowledge of the theft was widespread at Hytera, but never actually says so.[69] This is because the evidence does not support that conclusion.

Once again, the technical record—which the government does not seem to have reviewed, much

---

[68] *Id.* at 19.
[69] Gov. Sent. Mem. at 15–17.

less understood—makes clear why the indicted individuals kept their theft secret from Hytera's engineers. Throughout the spring of 2008, when GS was at Hytera but his "team of experts" had not yet arrived, he sent Hytera's confidential chip schematics to his co-defendants to evaluate (thereby breaching Hytera's confidentiality).[70] Those schematics showed that Hytera used an FPGA chip, which required a very different type of programming from the Texas Instruments OMAP processor used in Motorola's radios.[71] In order for the Motorolans to make the most use of Motorola's existing technology, they decided they would need to convince Hytera to ditch the FPGA chip, and rewrite all of the related programs Hytera had already accomplished using that chip, and use only an OMAP processor like Motorola.

When discussing this transition, Chia noted that his "one concern" was "performance"—specifically, "will the FPGA [i.e., Hytera's chip] perform better than the SW [software] approach we have."[72] Chia's concern was legitimate. It would be very hard for the new engineers to recommend to Hytera that it discard its FPGA chip if Hytera had test results showing that the FPGA outperformed the OMAP processor. Chia's concern was later magnified when he joined Hytera and discovered that Hytera was 70% to 80% done with the work needed to develop a DMR radio—work that would need to be re-done if they discarded the FPGA chip:[73]

> ## FPGA Summary
> - **Pros**
>   – About 70% to 80% of the work has been completed.

But that is exactly what the former Motorolans did upon their arrival at Hytera. They discarded Hytera's existing FPGA chip, and all of the code that had relied on it, in favor of the OMAP processor

---

[70] Def. Ver. at 23 n.147, Exs. 96–98.
[71] *Id.*
[72] Def. Ver. at 23 n.148, Ex. 101.
[73] *Id.* at 23 n.149, Ex. 102. Indeed, Chia conceded that the FPGA's performance and development ease were "excellent." *See* Ex. 103.

used by Motorola.[74] Obviously, the indicted individuals' decision to throw out extensive existing work product and start over with a new chip so close to the finish line was not orchestrated by Hytera's leadership. The team announced the change to Hytera in communications criticizing the FPGA chip so as to justify this design choice.[75] But in emails among themselves, the former Motorolans discussed the real reason for the change: incorporating an OMAP processor would enable them to "re-use" Motorola code in developing a DMR radio.[76]

Of course, this change was awkward to explain to Hytera's existing engineers. YT Kok expressed concern that Hytera's engineers may not understand or agree with their planned proposal because they did not know about the Motorolans' planned "re-use" of Motorola code.[77] Sure enough, as these design choices were implemented Dr. Sun, Hytera's head of R&D, became angry and frustrated and left Hytera's Shenzhen headquarters to move to Harbin to lead development on a different kind of radio technology.[78]

As time went on, the former Motorolans continued to take steps to hide their possession of copied Motorola code and documents from the rest of Hytera. They converted the code into libraries to mask any comments indicating its authors or origin.[79] They maintained Motorola's code on separate laptops that only the former Motorolans could access, and did not upload it to Hytera's servers.[80] They communicated with each other in English through their personal email accounts and excluded anyone from Hytera in those discussions.[81]

The government suggests that Hytera employees nevertheless knew and discussed that they were

---

[74] Def. Ver. at 23.

[75] *Id.* at 23; *see also* Ex. 103.

[76] *Id.* at 23 n.149–150, Exs. 102–105.

[77] *Id.* at 24 n.151, Ex. 106.

[78] *Id.* at 24 n.152, Ex. 2F.

[79] *Id.* at 24 n.153.

[80] Gov. Ver. Ex. D at FBIMAIN_010-000001–33.

[81] *See, e.g.,* Ex. 49 at 8–9 (G.S. noting he solely used his personal Hotmail account to communicate with the Former Motorolans in 2007).

using Motorola code.[82] But in support, it points to emails in which one Hytera employee (HN) discussed sending a *library* of code to another Hytera employee and asked her to keep that library confidential.[83] A library is a non-human-readable file created to conceal the code inside of it.[84] Nothing in HN's email, or anywhere else, suggests that HN knew that library was made using Motorola's source code. Nor would an engineer sending around a library file be unusual; there are more than 300 libraries in Hytera's code that bear no relationship to Motorola code.

The government also highlight's HN's deposition testimony that she kept "things related to DSP" (a DMR feature) confidential at her boss Sam Chia's direction.[85] But again, that is normal behavior for code developers at any company, as developing code in silos is a common practice for security purposes.[86] Same at Hytera - the DSP group, along with certain other software development teams, worked in silos, meaning that they did not share their code outside of their specific team.[87] HN explained at her deposition that the DSP team kept their work confidential for security reasons:

> If I upload this to the [Hytera's database], somebody may download it and steal it. Because it had already happened before, that someone stole the codes and sold them for money.[88]

Nor do the government's handful of examples show that Hytera employees who were not involved in the theft had access to stolen trade secret information.[89] The government points to a November 4, 2008, email describing "4FSK max deviation," which is simply a measure of how in-tune a radio must be to generate and interpret digital radio signals, but fails to note that the document referenced is a *Hytera*

---

[82] Gov. Sent. Mem. 9–11.
[83] *Id.*
[84] Def. Ver. at 24 n.153; *see also* Def. Ver. at 61–62.
[85] Gov. Sent. Mem. 9–11.
[86] Def. Ver. at 62 n.389, Ex. 218.
[87] *Id.* at 62 n.388, Ex. 2H.
[88] Gov. Ver. at 11.
[89] Gov. Sent. Mem. at 15–17.

document, with Hytera branding on every page.[90] It further points to a September 11, 2008, internal Hytera email attaching a "template" document showing that Motorola-branded labeling had been removed with tracked changes prior to circulation.[91] But the document itself had no technical or competitive value (even with the tracked deletions included), and was very clearly shared as a stylistic template.[92] Indeed, the tracked changes dated from 2004—predating the theft and even Motorola's launch of DMR by many years.[93] Finally, the government points to an email purporting to attach a "moto DMR production debugging document"—but does not attach the actual document as an exhibit, or try to explain what that document is, how it relates to any asserted trade secrets, or where it came from. Dr. Wicker admitted at trial that the debugging document attached to the email did not appear in the indicted codefendants' COMPASS downloads.[94]

Abundant evidence makes clear that not all Motorola documents found at Hytera that were labeled "Motorola confidential proprietary" were even confidential, let alone trade secret.[95] Instead, some documents and code bearing those labels were publicly available or provided to Hytera by dealers.[96] This is unsurprising and common competitive behavior—Motorola likewise possessed many Hytera confidential documents in its files, which Motorola gained through competitive intelligence.[97]

### F. Hytera Terminated GS, YT, and Sam Chia in 2018 for Failing to Cooperate in Hytera's Investigation of their Misconduct

Hytera fired GS, YT, and Sam Chia in October 2018 once it became clear they were not

---

[90] Civ. Trial Tr. (Wicker) at 1552:18–24; (Grimmett) at 4807:15–21.
[91] Civ. Trial Tr. (Wicker) at 1573:5–9.
[92] Gov. Ex. EE (email requesting "SRS template").
[93] Civ. Trial Tr. (Wicker) at 1572:7–1573:16.
[94] Civ. Trial Tr. (Wicker) 1795:4–1796:11.
[95] Civ. Trial Tr. (Boerger) at 664:11–666:5.
[96] *Id. See also* Civ. Trial Tr. (Grimmett) at 4417:6–4418:5 (explaining why it would not be unusual to have testing documents with "Motorola" in the filename).
[97] Civ. Trial Tr. (Karpoor) 1028:18–1033:14; (Wicker) 1598:17–1608:24.

cooperating in Hytera's internal investigation.[98] The government points to the fact that Hytera paid them severance as part of their firing, but fails to understand that they were subject to foreign employee rights laws that made it difficult to simply terminate them. GS, for example, was a contract employee under UK law, and Hytera negotiated a settlement agreement that resulted in his termination and prohibited him from competing with Hytera.[99] Notably, GS later attempted to create a company called "Hytera Consulting," which he abandoned after Hytera sent a cease-and-desist letter.[100]

The government inaccurately claims in a footnote that "GS continued to work as a contract employee for Hytera after his purported termination[.]"[101] This is false. While at Hytera, GS had worked with Danimex, a Danish client that purchased various types of non-DMR two-way radios from Hytera. Apparently unhappy with the level of technical support Danimex was receiving for Hytera products *unrelated* to this case, a friend of Kok's at Danimex sent an email to Kok's personal email address to inquire about obtaining better technical support from Hytera.[102] Kok had just been fired from Hytera and wanted to start his own consulting business in the two-way radio industry, so he traveled from the United Kingdom to Denmark to assist Danimex.[103] Kok also reached out to some of his former Hytera colleagues, again using his personal email address, and asked them to help Danimex.[104]

After completing that one-off "job," as he described it to the FBI, Kok sought reimbursement of his travel expenses from a friend at Hytera.[105] Kok was not, however, a Hytera employee at that time—he had been formally terminated, which he acknowledged to the FBI.[106] Indeed, Kok had made clear to

---

[98] Civ. Trial Tr. (Luo) at 3247:5–3248:19.
[99] Dkt. 310 at 3, n.1.
[100] *Id.*
[101] Gov. Sent. Mem. n. 6.
[102] Dkt. 310 at 2 (citing FBIMAIN_003-000001).
[103] Ex. R-2, DOJ-CORRECTED_0019090.
[104] *Id.*
[105] Dkt. 310 at 2 (citing FBIMAIN_003-000001).
[106] *Id.*

Danimax, "This is my personal email address. Please acknowledge this as I camnot write on company email …please understand I am sticking my neck out if you forward this mail out I am fucking dead!"[107] Kok never suggested to the FBI that he was re-hired by Hytera or otherwise compensated by them following his termination.

At bottom, this entire conspiracy was a garden-variety IP theft committed by disgruntled employees and grifters. There was no larger geopolitical or business context. The government has decided to ignore the evidence staring at them in plain sight, and instead adopt Motorola's self-serving civil litigation positions. This Court should not do the same.

## III.    The Government Avoids a Substantive Analysis of Motorola's Lost Profits, and Its Shortcut Leads to Error

The government argues that "[b]ecause Hytera stole Motorola's trade secret information, used that information to accelerate its product development, and relied on Motorola's stolen technology in its products continuously throughout the conspiracy period, Motorola's lost profits were reasonably foreseeable to Hytera[.]"[108] But missing from its brief is any evidence about *which* specific trade secret information was stolen; *how* Hytera used that stolen information to develop a competing radio; and *whether* that specific use of stolen trade secret information caused customers to buy Hytera;s radios instead of Motorola's. Instead, the government shortcuts its job by gesturing towards the lost-profits opinion offered by Motorola's damages expert, James Malackowski, in the civil case. The government contends Malackowski's findings were "in line with the findings of the civil jury,"[109] and Motorola similarly contends (in its motion for leave to file a victim impact statement), that the jury "awarded damages based on" Malackowski's lost profits methodology.[110]

---

[107] Ex. R-2, DOJ-CORRECTED_0019090.
[108] Gov. Sent. Mem. 24, Dkt. 363.
[109] Gov. Sent. Mem. 38, Dkt. 363.
[110] Dkt. 369 at 3.

Those contentions are wrong. The jury in the civil case made *no* finding on lost profits, as both Judge Norgle and the Seventh Circuit confirmed.[111] Moreover, there are numerous flaws in Malackowski's methodology that were never addressed in the civil case (and which the government fails to address); it would be error for the Court to import that methodology here.

**A.    Motorola Abandoned Malackowski's Lost-Profits Analysis During Trial, and The Seventh Circuit Concluded It Was Error for Judge Norgle to Determine Lost Profits**

At the civil trial, Motorola presented two damages methodologies to the jury (1) disgorgement of Hytera's profits or (2) Motorola's lost profits. As here, Hytera presented extensive evidence and economic analysis demonstrating how Motorola had failed to prove its lost profits case.[112] In closing arguments at the civil trial, Motorola's counsel invited the jury to *disregard* the fact disputes in its lost profits and instead to focus on unjust enrichment, i.e., profit disgorgement[113]:

> Now here is the good news. If you award Motorola all of the unjust enrichment that it's entitled to, then you don't have to worry about actual loss or lost profits. . . . And so for the remainder of my remarks, I am going to focus on the unjust enrichment because that's where I believe you should focus as well.

Malackowski similarly deflected Hytera's challenges to his lost profits analysis by redirecting the jury to profit disgorgement, noting that if the jury went with that alternative methodology, "then lost profits can be set aside" and "[a]ny criticism of lost profits would, therefore, not matter."[114]

The jury took Motorola's invitation to ignore lost profits and award Motorola damages based on its profit disgorgement methodology.[115] Judge Norgle and the Seventh Circuit ultimately held that the

---

[111] Ex. R-3, Civ. Dkt. 1100 at 4 (¶¶ 11–12), 24 (¶ 81); Ex. R-4, Civ. Dkt. 1088 at 26; *Motorola Sols.*, 108 F.4th at 489, 494 (confirming that Hytera was denied a jury finding on lost profits but forfeited the argument on appeal).

[112] *See* Dkt. 364 at 19–24, 41–43; *see also* Dkt. 365-11, 365-12.

[113] Civ. Trial Tr. (Motorola closing) at 5706:19–5707:2

[114] Civ. Trial Tr. (Malackowski) at 5387:17–23.

[115] Ex. R-3, Civ. Dkt. 1100 at 4 (¶¶ 11–12), 24 (¶ 81); Ex. R-4, Civ. Ex. R-4, Dkt. 1088 at 26; *Motorola Sols.*, 108 F.4th at 489, 494 (confirming that Hytera was denied a jury finding on lost profits but forfeited the argument on appeal).

award was in error because profit disgorgement is an equitable remedy.[116] The jury's damages verdict was therefore deemed advisory,[117] and thus a legal nullity with zero effect.[118]

The government next says that Judge Norgle "adopted" and "approved" Malackowski's methodology and opinion regarding lost profits.[119] That is also false. The only statement Judge Norgle made regarding Motorola's lost profits claim was that the jury's (advisory) award disgorging Hytera's profits under DTSA exceeded Motorola's lost profits claim of $86.2 million under DTSA.[120] Judge Norgle never addressed or resolved any of Hytera's challenges to Motorola's methodology. He did not need to, because he adopted the jury's advisory award on profit disgorgement (with one modification), which exceeded Motorola's maximum claim.[121] That is, Judge Norgle's statement referring to "Motorola's lost profits" was dictum.

Because Judge Norgle's dictum about lost profits was not part of the final judgment, Hytera did not address it in its opening brief on appeal. When Motorola raised lost profits in its response brief, Hytera explained that the Seventh Circuit could not rely on Judge Norgle's dictum, because, among other reasons, Hytera was entitled to a jury trial on lost profits, and there was no jury award on that. The Seventh Circuit agreed with Hytera, finding that Judge Norgle could not have made (and therefore did not make) a proper finding on Motorola's lost profits, because the legal remedy of lost profits is for a jury to award.[122] As a

---

[116] *See* Ex. R-3, Civ. Dkt. 1100 at 4 (¶¶ 11–12), 24 (¶ 81); Ex. R-4, Civ. Dkt. 1088 at 26; *Motorola Sols.*, 108 F.4th at 491 (noting that Judge Norgle's submission of disgorgement to the jury was "mistaken").

[117] Ex. R-4, Civ. Dkt. 1088 at 1, 24, 26, 29, 32; Ex. R-5, Civ. Dkt. 1099; Ex. R-3, Civ. Dkt. 1100 at 3.

[118] *Price v. Marshall Erdman & Assocs., Inc.*, 966 F.2d 320, 324 (7th Cir. 1992) (comparing "the effect of an advisory jury's verdict (none) with the effect of a real jury's finding . . . (preclusive)"); *OCI Wyoming, L.P. v. PacifiCorp*, 479 F.3d 1199, 1206 (10th Cir. 2007) (appellate review of findings with an advisory verdict conducted "as if there had been no verdict from an advisory jury") (citation omitted).

[119] Gov. Sent. Memo at 25–26, 38.

[120] Ex. R-3, Civ. Dkt. 1100 at 4 (¶10).

[121] Ex. R-3, Civ. Dkt. 1100 at 39 (¶ 40).

[122] *See Motorola Sols.*, 108 F.4th at 489 ("the amount of Motorola's lost profits is a legal (not equitable) remedy on which Hytera is entitled to a jury finding in the first instance"). The Seventh Circuit ultimately held that Hytera had forfeited this argument by not raising it in its opening appellate brief, so Judge Norgle's improper dictum on lost profits rendered Judge Norgle's error in failing to apportion the DTSA disgorgement harmless error. *Id.*

result, there is no lost profits finding—by judge or jury—that this Court can import and adopt here. Instead, this Court must make its own factual findings in the criminal case—based on a record that the government has failed to develop—if it is going to impose a fine or order restitution based on Motorola's purported lost profits.[123]

### B. The Government Has Failed to Define the Trade Secrets at Issue in the Criminal Case

First, as Hytera explained in its opening brief, the government has failed to explain *what* the trade secrets are in the criminal case, and their Sentencing Memorandum continues to remain radio silent on this critical issue. The civil case involved 21 purported trade secrets—this case involves 15, and not all of the purported trade secrets claimed in the criminal case were claimed in the civil case.[124] The parties are one week from sentencing, and government has yet to explain what the trade secrets in the criminal case are in any court filing in this case. How the government can recover lost profits based on unidentified trade secrets (including those it never presented any evidence about to the grand jury) remains a mystery.[125]

---

[123] Hytera has already explained in its opening brief why the $135.8 million compensatory judgment from the civil case cannot serve as the measure of "pecuniary gain" in this case—because the Seventh Circuit found that Judge Norgle failed to conduct the necessary apportionment analysis. Dkt. 364 at 28–29. The government's claim that the $135.8 million can serve as the measure of pecuniary gain for purposes of calculating the fine is error.

[124] *Compare, e.g.*, Ex. R-6, October 20, 2019 email from B. Barath ("Motorola hereby withdraws the following trade secrets: nos. 2, 23, 30, 65, 1, 80, 129 from this case.") *and* Ex. R-7, November 5, 2019 email from B. Barath ("Motorola hereby withdraws trade secret no. 130.") *with* Ex R-8, GJ Exhibit 48 (listing, *inter alia*, trade secret Nos. 30 (H), 65 (G), and 130 (J)).

[125] *Mangren Rsch. & Dev. Corp. v. Nat'l Chem. Co.*, 87 F.3d 937, 945 (7th Cir. 1996); *Euroholdings Cap. & Inv. Corp. v. Harris Tr. & Sav. Bank*, 602 F. Supp. 2d 928, 936 (N.D. Ill. 2009) ("When seeking recovery of lost profits under Illinois law, the lost profits must be established with a reasonable degree of certainty and be traceable to defendant's wrongful conduct." (citing *TAS Distrib. Co., Inc. v. Cummins Engine Co.*, Inc., 491 F.3d 625, 633 (7th Cir. 2007)); *see also Hunter Bldgs. & Mfg., L.P. v. MBI Glob.*, L.L.C., 436 S.W.3d 9, 17–21 (Tex. App. 2014) (reversing lost profits damages where plaintiff's expert failed to connect lost sales to use of specific trade secrets); Aron Decl. ¶¶ 44–46, Dkt. 365-12 (Dr. Aron explaining that "quantification of lost profits damages" requires "isolate[ing] the effects of the offense").

**C.      Any Findings From the Civil Case Were Made Under a Preponderance-of-the-Evidence Standard, Which Does Not Apply Here**

Even if Judge Norgle had "adopted" Malackowski's lost-profits analysis, as the government claims,  he would have done so under the civil preponderance-of-the-evidence standard.[126] But here, the amount of Motorola's lost profits is relevant to several issues at sentencing where a higher standard of proof applies due to the Indictment's *Apprendi* errors that are being corrected through the Plea Addendum.[127] As the government concedes, to the extent that lost profits are relevant to the statutory maximum fine, the Court must apply the beyond-a-reasonable-doubt standard.[128]

Accordingly, a higher standard of proof applies here than Judge Norgle would have employed in the civil case. As a result, the Court will need to make its own findings of Motorola's lost profits based on the meager factual record developed by the government in this case, or else conclude that the government has failed to carry its burden.

**D.      Malackowski's Lost-Profits Analysis Is Substantively Flawed**

Even had the government identified which Motorola trade secrets Hytera purportedly stole, and which trade secrets it actually used in its DMR radios, Malackowski's opinion is both legally and factually flawed, and therefore unreliable.

**1.      Malackowski's Market-Share Approach Is Not Appropriate for this Case**

Malackowski claims to have used a market share approach approved in a Federal Circuit patent case, *State Industries, Inc. v. Mor-Flo Industries, Inc.*, 883 F.2d 1573, 1578 (Fed. Cir. 1989).[129] In *Mor-Flo*, the Federal Circuit explained that "[a] standard way of proving lost profits, first announced in *Panduit*

---

[126] Gov. Sent. Mem. at 38, Dkt. 363.

[127] *Cf. Guenther v. Holmgreen*, 738 F.2d 879, 888 (7th Cir. 1984) ("It is, of course, well established that issue preclusion may be defeated by shifts in the burden of persuasion or by changes in the degree of persuasion required.").

[128] Gov. Sent. Mem. at 32, Dkt. 363 (citing *Apprendi v. New Jersey*, 530 U.S. 466 (2000)).

[129] *See* Malackowski 302 at 3 (Oct. 29, 2025) ("In his analysis, MALACKOWSKI used industry-standard methodologies developed from the 'MOR-FLO' case . . . .").

*Corp. v. Stahlin Bros. Fibre Works*, 575 F.2d 1152, 1156, 197 USPQ 726, 730 (6th Cir.1978), is for the patent owner to prove: '(1) demand for the patented product, (2) absence of acceptable noninfringing substitutes, (3) his manufacturing and marketing capability to exploit the demand, and (4) the amount of the profit he would have made.'"[130] The market-share approach employs a modification of the second *Panduit* factor such that, in an appropriate case, the patent owner can "substitute[e] proof of its market share for proof of the absence of acceptable substitutes."[131]

The Federal Circuit has since confirmed that this kind of market-share approach is only appropriate in cases where the original and infringing products are effectively interchangeable.[132] In other words, establishing lost profits via a market share approach is appropriate where consumers have no preference among the various available alternatives, as was the case in *Mor-Flo*. On the other hand, where other considerations—like lower prices, product differences, or product availability—would have steered consumers away from a plaintiff's products, the market-share approach is inapposite.[133]

Here, as explained in more detail below, Motorola and Hytera manufacture very different DMR radios targeted towards very different audiences. Motorola's products are significantly more expensive than Hytera's. Hytera, by contrast, makes a lower priced DMR radio with unique features, often customized for particular customers. The companies' distribution networks also cover different geographic footprints. This is not a Coke vs. Pepsi situation, where Hytera and Motorola customers would each simply purchase the other company's radio if their first choice were unavailable. Thus, as a legal

---

[130] *Mor-Flo*, 883 F.2d at 1577.

[131] *BIC Leisure Prods., Inc. v. Windsurfing Int'l, Inc.*, 1 F.3d 1214, 1219 (Fed. Cir. 1993) (citing *Mor-Flo*, 883 F.3d at 1578).

[132] *See, e.g.*, *BIC Leisure Prods.*, 1 F.3d at 1218 (district court erred by relying on *Mor-Flo* to award market-share lost profits where patent owner's product was significantly more expensive than defendant's, and other market participants sold non-infringing products "resembling" the defendant's products "in the same distribution channels" at lower prices); *see also Kaufman Co. v. Lantech, Inc.*, 926 F.2d 1136, 1142 (Fed. Cir. 1991) ("noninfringing substitute must not have a disparately higher price than or possess characteristics significantly different from the patented product . . . [t]o be deemed acceptable" for purposes of *Panduit* factors).

[133] *BIC Leisure*, 1 F.3d at 1218.

matter, Malackowski's *Mor Flo* market share approach does not work for calculating lost profits in this case.

### 2. Malackowski's Market-Share Analysis Is Based on Unfounded Assumptions and Cannot Establish Lost Profits Here

Malackowski's market share analysis is also grounded in unfounded factual assumptions, rendering it factually deficient in addition to legally inappropriate. First, Malackowski wrongly assumes that if Motorola's trade secrets had not been misappropriated, Hytera would not have launched a non-infringing DMR product by June 2019.[134] In reality, eighteen other manufacturers—many of whom were significantly smaller than Hytera—were able to launch DMR products by 2014 without access to Motorola trade secrets.[135] In fact, Hytera launched a totally separate line of DMR radios in 2014 and Motorola's own expert witness—the same expert witness that the government uses here—admitted that those DMR radios were independently developed and did not use Motorola's intellectual property.[136] Notably, Hytera's non-infringing DMR radios implement may of the same features as its infringing radios without using any copied code.[137]

Second, Malackowski assumed that *no* buyers who purchased infringing DMR radios from Hytera would have instead purchased non-infringing DMR radios manufactured by Hytera or Hytera analogue radios.[138] But at a minimum, "if Hytera were not offering its accused DMR products, it is reasonable to expect that some (or all) of the customers who were augmenting their already-installed Hytera analog or low-end DMR system would have chosen to augment it with additional Hytera analog or low-end DMR radios."[139]

---

[134] Aron Decl. ¶ 31, Dkt. 365-12.
[135] Grimmett Rpt. ¶ 37, Dkt. 365-1.
[136] Civ. Trial Tr. (Wicker) at 5123:17–5126:2.
[137] *See* Civ. Trial Tr. (Xu) at 3356:3–3357:5, 3297:25–3300:16.
[138] Aron Decl. ¶ 54, Dkt. 365-12.
[139] Aron Decl. ¶ 54, Dkt. 365-12.

Third, Malackowski assumes that buyers who actually purchased infringing radios from Hytera would have, if those radios were not on the market, purchased alternative radios from a specific subset of available alternatives. He does not consider whether buyers might have simply continued to use their existing radios.[140] Again, reality paints a different picture: "As Motorola's own documentation shows, customers were slow to adopt low-tier digital. Many customers continued using their analogue radios for many years after Motorola and Hytera launched their digital radios, in part because there was no regulatory need to switch."[141] Put another way, "[w]hile a customer may have been willing to purchase Hytera's DMR products—which sold at a relatively low price point relative to Motorola's DMR prices—they may not have been willing to pay higher prices for DMR radios from other companies for upgrades that they may have seen as luxury rather than a necessity given their already-existing and functional analog system."[142]

Fourth, Malackowski assumes that Motorola would capture a percentage of Hytera sales of infringing DMR radios proportional to Motorola's share of the market.[143] Malackowski does not attempt to justify his decision to use this approach,[144] and does not explain how it could constitute "sound economic proof of the nature of the market and likely outcomes with infringement factored out of the economic picture."[145] Malackowski may not have done so because—as a Certified Public Accountant with no training in economics—he is not qualified to offer an opinion regarding economic issues.[146]

But as Dr. Aron and Dr. Bilgicer have explained, contrary to Malackowski's market-share

---

[140] Aron Decl. ¶¶ 32, 61, Dkt. 365-12.

[141] Grimmett Rpt. ¶ 49, Dkt. 365-1 (footnotes omitted).

[142] Aron Decl. ¶ 61, Dkt. 365-12.

[143] Aron Decl. ¶¶ 32–33, Dkt. 365-12.

[144] Aron Decl. ¶ 56, Dkt. 365-12 ("Mr. Malackowski has not offered support for that assumption, such as by analyzing whether it aligns with market evidence of how consumers made purchasing decisions."),

[145] Grain Processing Corp. v. Am. Maize-Prods. Co., 185 F.3d 1341, 1350 (Fed. Cir. 1999).

[146] *See* Ex. MM to Gov. Ver., ¶ 3 (outlining Malackowski's qualifications, such as "majoring in accountancy and philosophy").

assumption, "there are multitude of reasons to expect that—in the but-for world where Hytera's Accused Products are unavailable—customers would be more likely to switch to non-Motorola suppliers rather than to Motorola."[147] Those reasons include: (i) empirical evidence demonstrating that "when demand for Hytera's products was negatively affected in the U.S, Motorola's market share in the U.S. did not increase, instead other vendors gained market share,"[148] (ii) many of Hytera's customers purchased from Hytera because it, unlike Motorola, developed differentiating features and business practices that met those customers' needs;[149]; (iii) many Hytera customers are located in regions where Motorola's distribution network is either weak or not present, which Malackowski ignores by relying on a coarse outside-US market share;[150] (iv) "Motorola positions itself at the premium end of the market," whereas "Hytera competes primarily on value-oriented products";[151] (v) "Motorola's customers are generally more exclusive and brand-loyal dealers, while Hytera's dealers typically sell products from several manufactures";[152] and (vi) "Motorola typically serves larger, less price-sensitive organizations, while Hytera focuses more on smaller, value-oriented customers."[153]

Finally, Malackowski did not consider the benefits Motorola received from Hytera's launch of a DMR product in 2010, which fostered adoption of Motorola's DMR standard in 2010. Before Hytera launched a DMR product, Motorola recognized that it faced a "███████████" where it could have lost its investment in DMR, while its competitors, particularly Asian competitors ICOM, Kenwood and

---

[147] Bilgicer Rpt. ¶ 192, Dkt. 365-11; *accord* Aron Decl. ¶ 48, Dkt. 365-12.

[148] Bilgicer Rpt. ¶ 172, Dkt. 365-11; *accord id.* ¶¶ 171–77.

[149] *E.g.*, Grimmett Rpt. ¶¶ 79–97, Dkt. 365-1; Aron Decl. ¶ 58 n.118, Dkt. 365-12 (collecting cites); *see also id.* ¶ 80; *cf.* Def. Ver. at 33 n.231 Ex. 152 at 20 (PDF p. 310).

[150] *See* Aron Decl. ¶ 58, Dkt. 365-12; Bilgicer Rpt. ¶ 171, Dkt. 365-11.

[151] Bilgicer Rpt. ¶ 90, Dkt. 365-11.

[152] *Id.* ¶ 98; *see also BIC Leisure*, 1 F.3d at 1218 (customers likely would not have switched to the plaintiff's product in proportion to its market share because, among other reasons, customers would have switched to alternatives sold in "the same distribution channels as" the infringing product)

[153] Bilgicer Rpt. ¶ 101, Dkt. 365-11.

other adopters of the competing dPMR standard gained ground in the market.[154]

### 3.    Malackowski's Analysis Is Filled With Basic Errors

Finally, Malackowski made basic errors when calculating the profit margin on those sales. He failed to account for ▮ million in Motorola management costs,[155] and also failed to include ▮ million in research-and-development costs.[156] Although these deductions were not argued during the civil trial, Judge Norgle acknowledged they were proper to deduct from revenue when calculating profit (in the context of setting the royalty rate), and Malackowski's and Motorola's only objection at that stage was that the deduction had not been made during the civil trial.[157]

## IV.    The Government's Remaining Guidelines Calculations are Incorrect

Hytera's Sentencing Memorandum explained why the government's calculation of Hytera's culpability score and enhancement for obstruction of justice are not appropriate.[158] The government's remaining enhancements now requested by the government are also inappropriate for the reasons detailed below.

### A.    No Evidence Supports the Government's Requested Enhancement Under U.S.S.G. § 2B1.1(b)(14)

Under U.S.S.G. § 2B1.1(b)(14), a two-level enhancement is appropriate only if "the defendant knew or intended . . . that the trade secret would be transported or transmitted out of the United States[.]" The government claims that such an enhancement is appropriate here because the individual defendants downloaded documents from Motorola's Compass servers, and some Compass servers were located in the United States.[159]

---

[154] Def. Ver., Ex. 21 Moto-1973-06803270 at *3274.
[155] Aron Decl. ¶¶ 62–69, 76, 89–90, Dkt. 365-12,
[156] Id. ¶¶ 70–72, 76, 89–90.
[157] Civ. Dkt. 1289 at 20–22.
[158] Hytera Sent. Mem. at 30–33, Dkt. 364.
[159] Gov. Sent. Mem. at 29, Dkt. 363.

The government does not identify any evidence that the files downloaded by the individual defendants actually came from servers located in the United States, that the individual defendants "knew or intended" that the files would come from the United States, much less that anyone at *Hytera* knew or intended such information. This is because all available evidence suggests the materials were almost certainly downloaded from servers near Malaysia or China.[160] And of course, the government cannot actually prove where any information was downloaded from in 2008 because Motorola deleted Compass's server logs and configuration files before filing the civil suit.[161] Therefore, where precisely any information was downloaded from has been lost forever, and no enhancement under U.S.S.G. § 2B1.1(b)(14) is warranted.

### B. The Proper Guidelines Offense Level Is 12, Producing a Guidelines Fine Range of $98,000 to $196,000

In sum, as explained in Hytera's opening brief and here, the base offense level for an offense under 18 U.S.C. § 1832 is 6.[162] The offense level should be increased to 12 because the offense occurred outside of the United States.[163]

No enhancement is warranted under U.S.S.G. § 2B1.1(b)(1), because the government has failed to establish the loss caused by the offense, i.e., Motorola's lost profits.[164] Further, Hytera's gain proximately caused by the offense—even if it had been established, which it has not—is not available here as an alternative measure of loss under U.S.S.G. § 2B1.1(b)(1).[165]

---

[160] *See* Jacobsen Rpt. ¶ 44, Dkt. 221-10 (Motorola's Compass and ClearCase systems "used numerous servers and databases located at Motorola facilities around the world, including in Malaysia and China"); Luk Rpt. ¶ 65, Dkt. 281-2 ("For remote offices, Motorola deployed multiple caching servers around the world.").

[161] Dkt. 221 at 5–8, 15–16.

[162] U.S.S.G. § 2B1.1(a)(2).

[163] U.S.S.G. § 2B1.1(b)(10)(B).

[164] *See supra* § III.E; Hytera Sent. Mem. at 19–23, Dkt. 364.

[165] *See United States v. Andersen*, 45 F.3d 217, 221 (7th Cir. 1995) ("While gain may normally prove an adequate surrogate for loss, gain may be used only as an alternative method of calculation when there is in fact a loss, and only if use of the gain results in a 'reasonable estimate of the loss.'" (citation omitted)).

An offense level of 12 produces a base fine amount of $70,000.[166] Coupled with a culpability score of 7, for the reasons explained in Hytera's Sentencing Memorandum,[167] that base fine amount produces a Guidelines fine range of $98,000 to $196,000. U.S.S.G. § 8C2.6, which is lower than the default maximum fine of $5 million.[168]

## V.    The Government's Analysis Regarding Restitution Is Incorrect

### A.    The Complexity Exception to the MVRA Applies Here

The government has articulated two reasons why the Court should reject the PSR's conclusion that the complexity exception applies.[169] The government first asserts that a restitution order is necessary because Hytera has not paid the full judgment entered in the civil case.[170] But Hytera is already paying down the civil judgment as quickly as its finances allow, including by paying over ███ million this year alone.[171] Hytera simply does not have more available free cash to provide Motorola. Moreover, that ███ million, along with all other judgement-related payments to Motorola made before sentencing, must be credited against any restitution ordered.[172]

The government's second argument is that "estimating restitution is not particularly complex here," which is based on its mistaken belief that Judge Norgle in the civil case "concluded that Dr. Malackowski accurately calculated the losses to Motorola."[173] But as explained above,[174] Malackowski's findings about lost profits from the civil case cannot simply be imported here. The Court should therefore

---

[166] U.S.S.G. § 8C2.4(d).

[167] Hytera Sent. Mem. at at 30–37, Dkt. 364.

[168] 18 U.S.C. § 1832(b).

[169] PSR ¶ 142.

[170] Gov. Sent. Mem. at 42, Dkt. 363 ("To date, Hytera has paid only a part of the civil judgment").

[171] Hytera Sent. Mem. at 45–47, Dkt. 364; *see also Lagos v. United States*, 584 U.S. 577, 584 (2018) ("there is no reason to think that collection efforts related to a criminal restitution award would prove any more successful" than efforts to collect on a civil judgment).

[172] *United States v. Malone*, 747 F.3d 481, 485 (7th Cir. 2014) ("Any amount the victim has received from the defendant in a civil suit as of the time of sentencing qualifies as 'property that is returned' and must be used to reduce the restitution amount to prevent double recovery by the victim.") (quoting 18 U.S.C. § 3663A(b)(1)(A)(ii)).

[173] Gov. Sent. Mem. at 42–43, Dkt. 363.

[174] *See supra* § III.E.

adopt the PSR's recommendation that the complexity exception to the MVRA applies, including for the reasons outlined in Hytera's opening brief.

### B. The MVRA Does Not Permit Recovery of Lost Profits as Restitution for Property Offenses

The government also fails to grapple with the limitations the MVRA imposes on restitution in this case. An award of restitution can only flow from the text of the MVRA, not a reflexive desire to compensate Motorola:

> Congress has enacted many different restitution statutes with differing language, governing different circumstances. Some of those statutes specifically require restitution for the "full amount of the victim's losses," defined to include "any . . . losses suffered by the victim as a proximate result of the offense." *See* 18 U.S.C. §§ 2248(b), 2259(b), 2264(b), 2327(b). The Mandatory Victims Restitution Act, however, contains no such language; it specifically lists the kinds of losses and expenses that it covers.[175]

It would be error for this Court to simply "interpret [the MVRA] in a way that favors an award."[176] Instead, the Court must determine whether the MVRA allows a particular loss to be included in a restitution order, which in turn requires consideration of "the statute's wording, both its individual words and the text taken as a whole."[177]

For "an offense resulting in damage to or loss or destruction of property," the MVRA permits restitution orders to require the defendant to "return the property to the owner."[178] If and only if "return of the property . . . is impossible, impracticable, or inadequate" can a restitution order instead require payment.[179] And even then, the payment is limited to the value of stolen property or the diminution of

---

[175] *Lagos v. United States*, 584 U.S. 577, 583-84 (2018) (omission in the original).
[176] *Id.* at 583.
[177] *Id.* at 581.
[178] 18 U.S.C. § 3663A(b)(1)(A).
[179] 18 U.S.C. § 3663A(b)(1)(B).

value of damaged property.[180]

Here, a restitution order requiring Hytera to pay Motorola restitution for its lost profits does not involve the "return" of property since Motorola never had those profits in the first place. And there is no indication that Motorola's trade secrets have been "damaged" in any way; this is not a case where, *e.g.*, a company's trade secrets were posted on the internet thereby destroying any "independent economic value, actual or potential, from not being generally known."[181]

The government agrees that ordering Hytera to pay Motorola's lost profits as restitution would "reimburse the victim for income lost by such victim as a result of such offense."[182] But the MVRA allows for such reimbursement *only* "in the case of an offense resulting in bodily injury to a victim."[183] Because the MVRA permits reimbursement of lost income *only* for offenses resulting in bodily injury, not property offenses, the MVRA does not allow for recovery of lost profits in this case.[184]

While acknowledging the existence of a split among federal appellate courts,[185] the government contends the Court should follow the approach adopted by the Second Circuit in *United States v. Milstein*, 481 F.3d 132, 136-37 (2d Cir. 2007).[186] *Milstein*, however, eschews the statutory MVRA text and instead applies the amorphous-compensation approach that the Supreme Court subsequently rejected in *Lagos*. The other cases cited by the government likewise follow the same interpretive approach as *Milstein* and

---

[180] 18 U.S.C. § 3664A(b)(1)(B) (restitution award can require payment of "the value of the property" less "the value (as of the date the property is returned) of any part of the property that is returned").

[181] 18 U.S.C. § 1839(B)(3).

[182] 18 U.S.C. § 3663A(b)(2)(C).

[183] 18 U.S.C. § 3663A(b)(2).

[184] *See, e.g.*, *United States v. Mitchell*, 876 F.2d 1178, 1183 (5th Cir. 1989) ("Congress is clearly capable of authorizing restitution for lost income when it chooses to do so. Despite this fact, it has not included lost income in the type of restitution that may be ordered in property cases and, unless and until it amends the statute to include lost income, courts may not order such restitution in property cases." (citation omitted)); *see also* Hytera Sent. Mem. at 44 n.213, Dkt. 364 (collecting cases).

[185] Gov. Sent. Mem. at 38 n.12, Dkt. 363.

[186] *Id.* at 37.

do not even address whether lost profits are available as restitution under the MVRA.[187]

In any event, the Second Circuit's decision in *Milstein* is contrary to *United States v. Scott*,[188] where the Seventh Circuit expressly stated that restitution "does not extend to consequences beyond the diminution of the value of the property stolen or damaged."[189] Indeed, *Scott* explained that restitution would cover the cost of repairing a damaged factory but restitution would not be available for the factory owner's "loss of business while the factory is shut down awaiting repairs," i.e., its lost profits.[190] "[T]o blur the line would create a potential issue under the Seventh Amendment because the amount of criminal restitution is determined by the judge, whereas a suit for damages is a suit at law within the amendment's meaning." [191]Accordingly, restitution for property offenses "is less generous than common law damages" and does not extend to a victim's lost profits.[192]

### C.    *Apprendi* Requires That Restitution Fact-Finding Be Conducted Using a Reasonable Doubt Standard

It is Hytera's position that *Apprendi* requires any restitution fact-finding to be undertaken by a jury beyond a reasonable doubt.[193] While this point is currently foreclosed by Seventh Circuit precedent holding that "restitution is not a penalty for a crime for *Apprendi* purposes since 'restitution for harm done is a classic civil remedy,'"[194] the United States has taken the contrary view in an MVRA case that was recently argued before the Supreme Court.[195]

---

[187] *E.g., United States v. Beydoun*, 469 F.3d 102, 108 (5th Cir. 2006) (restitution award based on gross profits—and not net profits—improperly awarded windfall to the victim); *United States v. Jones*, 616 F. App'x 726, 728 (5th Cir. 2015) (same).

[188] 405 F.3d 615 (7th Cir. 2005).

[189] *Id.* at 618.

[190] *Id.* at 619–20.

[191] *Id.* at 619.

[192] *Id*. at 618.

[193] *See S. Union Co. v. United States*, 567 U.S. 343, 350 (2012) ("In stating *Apprendi's* rule, we have never distinguished one form of punishment from another.").

[194] *United States v. LaGrou Distribution Sys., Inc.*, 466 F.3d 585, 593 (7th Cir. 2006).

[195] Brief of the United States Supporting Vacatur at 5, *Ellingburg v. United States*, No. 25-482 (U.S. June 23, 2025) ("An examination of the 'statute's text and its structure,' *Smith v. Doe*, 538 U.S. 84, 92 (2003), shows that restitution is

**D.    Motorola's Request for Attorney's Fees Exceeds the Bounds of Restitution Under the MVRA**

Motorola also seeks $2,183,383.30 in restitution for expenses paid to Motorola's outside counsel and experts.[196] But again, recovery of attorneys' fees is strictly circumscribed under the MVRA.[197] Here, Motorola seeks reimbursement for several categories of fees and expenses that it is not entitled to even under its own cited authority.

For example, it is well-settled that "the government is responsible for preparing witnesses for trial, not [the victim's] lawyers."[198] Yet Motorola seeks tens of thousands of dollars for counsel's participation in "trial preparation meetings," as well as work preparing witnesses for trial.[199]

Similarly, "seeking restitution is the job of the government, not the victim or the victim's attorneys[.]"[200] Yet Motorola seeks reimbursement for its work collecting and organizing the very bills for which it seeks reimbursement.[201] Worse, it has submitted an invoice for $22,610 covering the expert work done by James Malackowski in support of the government's claim for restitution in the criminal case.[202] This is plainly improper—Hytera cannot be ordered to pay the fees of an expert witness the government seeks to use against it at sentencing.

Motorola also seeks reimbursement for its time responding to Hytera's third-party subpoena to Motorola which sought evidence in support of the government's unsubstantiated claims about Motorola's

---

integrated into the defendant's criminal sentence, and thus serves as part of his criminal punishment rather than a civil remedy.").

[196] Gov. Sent. Mem. at 36, Dkt 363; Moto. Victim Impact Stmt. at 34.

[197] See generally Lagos v. United States, 584 U.S. 577 (2018).

[198] *United States v. Yu*, 719 F. Supp. 3d 165, 170 (D. Mass. 2024) (allowing expenses relating to "preparation of witnesses for their interviews with the government, but not for trial").

[199] Ex. R-9, Moto-DOJ-07065177 (entries on December 6–8 for Mark Schneider—rows 31, 33, and 35 of the "Preparing Clients" tab). *See also, e.g.*, Ex. R-9, Moto-DOJ-07065177 (entries on December 18–20 for Mark Schneider and Laura Vartain relating to the trial preparation of witness Scott Shepard—rows 64, 68, 69, 71 of the "Preparing Clients" tab).

[200] *Id.* (reducing claimed expenses for seeking restitution by 80%).

[201] *See, e.g.*, Ex. R-9, Moto-DOJ-07065177 (entries on February 18–27, 2025 regarding preparation of report on "bills" and "billables"—rows 20, 21, 23, 25, 27, and 36 of "Seeking Restitution" tab).

[202] Moto-DOJ-07065173.

network infrastructure.[203] But this was a subpoena Hytera served directly on Motorola as part of gathering evidence for trial—attorneys' fees incurred in responding to such a subpoena are not recoverable under the MVRA.

The Supreme Court acknowledged that its "narrow interpretation [of the attorney fee provision of the MVRA] will sometimes leave a victim without a restitution remedy sufficient to cover some expenses . . . which he undoubtedly incurred as a result of the offense."[204] Fortunately for Motorola, it will not be left empty-handed. As discussed above, the civil judgment already yields hundreds of millions of dollars in windfall payments to Motorola—well in excess of the $2.2 million it seeks for attorneys' fees and costs associated with the criminal case. The *Lagos* Court contemplated that many crime victims will recover expenses through civil suits rather than restitution in criminal cases, *id.* at 584, and that is certainly the case here.

## VI.    Hytera Agrees With Probation's Suggested Conditions of Probation

The government has appropriately refused to advocate for many of Motorola's extreme probation demands. For example, the government is not parroting Motorola's demand that Hytera pay for a series of "independent experts" who would be tasked with expansive and ill-defined mandates to investigate Hytera during the term of probation. But the government still overreaches by seeking probation conditions that are neither necessary nor tethered to the requirements of 18 U.S.C. § 3563(b).

### A.    Proposed Mandatory and Standard Conditions

Hytera agrees to the mandatory and standard conditions proposed by Probation, with the caveat that the scope of proposed Standard Condition 7 needs clarification. That proposed condition states: "Defendant organization shall not waste, nor without permission of the probation officer, sell, assign, or transfer its assets." Read literally, this could require Hytera to seek permission of the probation office

---

[203] *See, e.g.*, Ex. R-9, Moto-DOJ-07065177 (730, 732–741, 743–755, and 757–765 of the "Subpoena and Request" tab).
[204] *Lagos*, 584 U.S. at 583.

every time it seeks to sell one of its products, which would be unworkable. Hytera does not believe that this was Probation's intent, and asks that the Probation Office's proposed Standard Condition 7 be modified as follows:

> "Defendant organization shall not waste its assets and shall provide notice about sales of any major asset(s) (i.e., excluding ordinary course transactions such as sales of inventory, receivables, or performance on purchase orders) in the amount of $5 million or more. Further, Hytera shall provide notice about any proceeds that Hytera will be receiving from such an asset sale before Hytera takes any steps to transfer those proceeds outside of Hytera's possession, custody or control."

## B.    Proposed Special Conditions

The sentencing code requires that discretionary conditions of probation be 1) "reasonably related to the factors" set forth in 18 U.S.C. § 3553(a)(1) and (a)(2), and 2) "involve only such deprivations of liberty or property as are reasonably necessary for the purposes indicated in section 3553(a)(2)."[205] The lone special condition that Probation requests is tailored to meet those standards. In contrast, a number of the government's proposals do not meet that standard.

### 1.    Proposed Conditions Relating to Hytera's Compliance Program

Neither the Probation Office nor the government question the quality of Hytera's compliance program. This is no surprise—as summarized in Hytera's Defendant's Version, Hytera has developed a world-class compliance program.[206] As a result, Probation saw no reason to ask for any conditions relating to Hytera's compliance program.

Hytera of course does not object to the government's request that it "maintain an effective compliance and ethics program"—it does so already and will regardless of this request.[207] Hytera also does not object to the proposed condition that Hytera report to Probation "any criminal prosecution, civil litigation, or administrative proceeding commenced against the organization, or any investigation or

---

[205] 18 U.S.C. § 3563(b); *see also* U.S.S.G. 8D1.3(c)

[206] Hytera has provided the Probation Office and the government with voluminous materials about its compliance program, and can make those materials available to the Court if helpful.

[207] Gov. Sent. Mem. 45, Dkt. 363.

formal inquiry by governmental authorities of which the organization learned since its last report."[208]

But the government's further demand that Hytera submit a report to Probation about the "nature and status" of its compliance program "no less than annually" is untethered to any actual purpose of sentencing and unnecessarily burdensome.[209] First, Hytera has already given the Probation Office a fulsome description of its compliance and ethics programs, including hundreds of pages of specific policies and how they are applied. Thus, the Probation Office already well understands the "nature" of Hytera's program.

Second, as related to the ongoing "status" of is compliance program, Hytera receives an annual certification from an outside auditor about its IP compliance program, which it is willing to provide to the Probation Office. Further, the Probation Office will have the power to ask for more information about Hytera's compliance program pursuant to proposed Standard Condition 2. Given that, it is not clear what forcing Hytera to produce otherwise unasked-for status reports will achieve. The government offers no specific rationale for it, and its more general concerns about the 2008 theft or Hytera's litigation positions have nothing to do with Hytera's current compliance regime. Accordingly, this demand should be denied.

### 2.     Proposed Condition Requiring Publication of Hytera's Crime

The government further asks that Hytera be ordered to extensively publicize its probation conditions and the fact of its conviction for years after sentencing. This demand goes well beyond what is necessary in light of the extensive disclosures about the criminal and civil cases that Hytera, Motorola and the government have already made and will continue to make.

Hytera, as a public company, has obligations to its shareholders and the public to disclose adverse material events. Accordingly, Hytera has repeatedly disclosed in a series of public filings and annual reports that it was charged and pleaded guilty in this case, as well as facts about the related civil

---

[208] *Id.*
[209] *Id.*

litigation.[210] In accordance with Chinese law, those reports are published not just on Hytera's website, but also on the Shenzhen Stock Exchange's site and disclosure platform, as well as in various newspapers, including SECURITIES DAILY, SECURITIES TIMES, SHANGHAI SECURITIES NEWS, and CHINA SECURITIES JOURNAL.[211] Hytera will also disclose the criminal sentence imposed which will be similarly publicized.

The government will also publicize the results of this case, as it already has done.[212]

But most notably, since Motorola initiated suit in 2017, over six hundred articles have been written about the parties' legal disputes and/or the subsequent criminal proceedings, at least fifty-five of which were authored by Motorola.[213] And that number continues to grow—Motorola posted its latest article about the litigation just two months ago.[214]

Motorola will continue to aggressively publicize its disputes with Hytera because it is part of its business plan. When Hytera abided by Judge Pacold's order to shut down its global operations in 2024, Motorola suppliers wrote letters to Hytera's customers in an effort to take Hytera's business. *See* Ex. R-12, Apr. 16, 2024, Letter to Hytera customer:

> As you may already know, Hytera was recently prohibited by court order from selling any products containing two-way radio technology anywhere in the world. More information regarding this prohibition can be found HERE [hyperlink to Motorola website]. Our company, BearCom, doesn't

---

[210] *See e.g.*, Def. Supp., Ex. 230 (2021 Ann. Rep.)(p. 127, PDF p. 408); Def. Supp., Ex. 231 (2022 Ann. Rep.) (p. 119, PDF p. 387); Def. Ver., Ex. 152 (2023 Ann. Rep.) (p. 124, PDF p. 405); Def. Supp., Ex. 232 (2024 Ann. Rep.) (p. 125, PDF p. 398); Ex. R-10, (2025 Semi-Ann. Rep.) (pp. 42, 51, 60, 195; PDF pp. 250, 259, 268, 403); Ex. R-11, (2024 Ann. Performance Forecast) (PDF p. 2–3).

[211] *See* Shenzhen Stock Exch., www.szse.cn/index/index.html?from=timeline (last visited Nov. 16, 2025); Secs. Daily, www.zqrb.cn/ (last visited Nov. 16, 2025); Secs. Times, www.stcn.com/ (last visited Nov. 16, 2025); Shanghai Secs. News, www.cnstock.com/ (last visited Nov. 16, 2025); China Secs. J., www.cs.com.cn/ (last visited Nov. 16, 2025).-

[212] See Federal Indictment Charges PRC-Based Telecommunications Company with Conspiring with Former Motorola Solutions Employees to Steal Technology, DEP'T OF JUST. (Feb. 7, 2022), www.justice.gov/archives/opa/pr/federal-indictment-charges-prc-based-telecommunications-company-conspiring-former-motorola; Chinese Telecommunications Company Pleads Guilty to Conspiracy to Steal Technology from Illinois-Based Motorola Solutions, DEP'T OF JUST. (Jan. 14, 2025), www.justice.gov/usao-ndil/pr/chinese-telecommunications-company-pleads-guilty-conspiring-steal-technology-illinois.

[213] Ex. R-13 (LexisNexis search); Ex. R-14 (Motorola articles written about Hytera).

[214] *See U.S. Federal Court Determines Hytera Continues to Use Motorola Solutions' Stolen Trade Secrets*, MOTOROLA SOLS. (Sept. 2, 2025), www.motorolasolutions.com/newsroom/press-releases/hytera-continues-to-use-stolen-trade-secrets.html.

> sell Hytera products, but we are the largest Motorola Solutions Partner in
> the United States and are here to help if you need any assistance.

While Motorola was attempting to lure Hytera's customers through such letters, it was simultaneously arguing in court for the shutdown to continue—until the Seventh Circuit intervened and provided Hytera emergency relief staying the injunction.[215]

Given these many publications, everyone in the two-way radio industry already knows the relevant issues. Accordingly, while Hytera will publicize the facts relating to its sentence, nothing further should be ordered.

### 3.     Proposed Condition Regarding Hytera's Asset Sales

Proposed Standard Condition 7, discussed above, assures that Hytera will not divert money it receives from asset sales.  Nonetheless, the government proposes that Hytera seek permission from the Court before selling any "material" asset.  Gov. Sentencing Memo 48 (proposing condition that "Hytera shall not sell, divest, or otherwise transfer any business, real estate, subsidiary, affiliate, or material asset without express permission of the Court.")  This proposal is overbroad and unworkable.

As a technology manufacturer, Hytera buys and sells hundreds of millions of dollars in assets annually.[216] Requiring Hytera to seek this Court's permission before making such sales would place a tremendous burden on this Court and Hytera for no purpose. Hytera's proposal to provide information about any major asset sales (over $5 million) that are not otherwise ordinary course business transactions ensures that proper notice will be given regarding any material asset sales.

### 4.     Proposed Condition Relating to Priority of Payment

Hytera does not object to paying any restitution obligation prior to any fine.

---

[215] *See* Order at 6, *Motorola Solutions Malaysia SDN. BHD v. Hytera Commc'ns Corp. Ltd.*, Case No. 24-1531 (7th Cir. Apr. 16, 2024) (ending contempt sanctions upon finding they had turned punitive over a full week earlier).
[216] Declaration of Hong Qiao ¶ 62, Dkt. 365-9.

**SA46**

### 5.     Proposed Condition to Comply with Civil Case Orders

The government is not joining Motorola's most extreme demands, including Motorola's proposed conditions that 1) the Court enjoin Hytera's sales; 2) Hytera receive Court approval to sell any new products, and 3) Hytera engage in an undefined and standard-less quarantine and data removal process. As the government noted, Motorola has made these same demands (to date, unsuccessfully) in the civil case, and they are inappropriate here, for the reasons explained in Hytera's Sentencing Memorandum.[217] But the government's request that this Court automatically adopt every civil case order, regardless of its relation to the charges in this case, and enforce it through the draconian sanction of violating Hytera's probation—goes beyond what is "reasonably necessary" under 18 U.S.C. § 3563(b).

First, this requirement is unnecessary because Hytera has obeyed the civil case's orders. Hytera has complied with dozens, if not hundreds, of orders from the civil case without issue, including an order that unfairly perpetuated the shutdown of Hytera's business operations and was reversed on appeal.[218]

Next, the focus in the civil case is now on Hytera's H-Series products. Hytera has almost no more accused products (which were at issue in the civil trial) available to sell. The charges in this case relate to the original accused products, not the H-Series. The H-Series was not even commercially launched until several months after the criminal indictment was handed down. Thus, the civil orders that the government wants this Court to reflexively import and enforce as probation conditions are based on different products, facts, standards, and legal procedures than those at issue in this case.

Finally, having this Court impose orders from the civil case as conditions of probation in the criminal case will lead to confusion and inefficiency. If the civil case's orders were deemed conditions of probation in the criminal case, any decision about whether Hytera complied with an order from the civil case would have to be resolved by this Court - it would be improper for this Court to delegate enforcement

---

[217] Hytera Sent. Mem. at 55, Dkt. 364.
[218] Order, *Motorola Sols., Inc. v. Hytera Commc'ns Corp.*, No. 24-1531 (7th Cir. Apr. 16, 2024), Dkt. No. 24.

of Hytera's probation conditions to another judge, as doing so would violate Federal Rule of Criminal Procedure 32.1, which sets forth the procedures for determining probation violations. But this Court would be forced to rely on rulings from Judge Pacold about the civil case's conditions or risk issuing conflicting decisions. Suffice it to say, this Court should enforce its own orders in this case and let Judge Pacold enforce her own orders in the civil case. This request should be denied.

## VII.    Hytera Has Proposed an ██ Million Per Year Payment Plan And Cannot Pay More

The law does not allow Hytera to be put out of business through excessive fines or restitution. U.S.S.G. §§ 8C2.2, 8C3.3 (courts must "avoid substantially jeopardizing the continued viability of the organization" through excessive fines). Nor should it. Hytera plays a critical role in the global telecommunications market.[219] With over ninety offices worldwide and a presence in over 120 countries, it is far more than just a radio manufacturer.[220] Hytera offers a comprehensive product line with command center infrastructure, body cameras, 4G, 5G, LTE technologies, and satellite communications.[221] The company develops products with voice, video, data, and artificial intelligence capabilities to be used by customers like local police and fire departments, school systems, airports, and major event venues.[222] It has built national-level public safety communications networks in over twenty countries, and provides communication systems to police in Brazil, as well as emergency communications networks in Spain, for the Maya Railway in Mexico, and the Ministry of Security and Justice in the Netherlands, among others.[223] Hytera's customers also include leading power battery manufacturers and energy efficient automobile manufacturers such as Tesla, Volkswagen, and BMW.[224]

Hytera further plays a leading global role in developing cutting edge telecommunications products.

---

[219] Def. Ver. at 32 n. 224, Ex. 154.
[220] *Id.* at 32 n. 223, Exs. 152, 153.
[221] *Id.* at 32 n. 226, Ex. 152.
[222] *Id.* at 32 n. 227, Ex. 152.
[223] *Id.* at 32 n. 229, Ex. 152.
[224] *Id.* at 32–33 n. 230, Ex. 152.

Over forty percent of Hytera's employees are dedicated to the research and development of technological solutions, and Hytera prides itself on creating bespoke products and features to fulfill the needs of specific customers.[225] It has R&D centers in Shenzhen (China), Harbin (China), Nanjing (China), Hebi (China), Bad Munder (Germany), Zaragoza (Spain), Vancouver (Canada), and Toronto (Canada).[226] Hytera's partnership with the Harbin Institute of Technology, (as noted, the equivalent to MIT in the United States), provides it with a steady supply of top Chinese engineering talent.[227] As of FY2023, Hytera engineers had applied for over 3,000 patents, nearly 2,000 of which had been granted.[228] Over 500 of Hytera's R&D engineers hold advanced degrees.[229]

As described in more than thirteen single-spaced pages of its Defendant's Version, Hytera now is publicly owned and traded on the Shenzhen Stock Exchange and has a robust compliance program designed to catch the type of misconduct committed by the indicted individuals here.[230] Hytera well understands that compliance pays, not crime, and it is committed to ensuring it never experiences the legal and financial hardships it currently faces again.

The legal saga between Hytera and Motorola has been going on for nearly a decade and needs to end. Hytera has already paid Motorola more than ███ million in compensatory damages, interest, and royalties on the accused products from trial.[231] Hytera has further sought permission to place cash in the full amount of all disputed H-Series royalties and interest (over ███ million) into the civil court's interest-bearing registry account as security pending its appeal of the H-Series order. Once that cash is in escrow, Hytera will have paid Motorola (or placed in escrow for its benefit) over ███ million.[232] It respectfully

---

[225] Def. Ver. at 33 n. 231, Ex. 152.
[226] *Id.* at 33 n. 232, Ex. 152.
[227] *Id.* at 33 n. 233, Ex. 3.
[228] *Id.* at 33 n. 234, Ex. 152.
[229] *Id.* at 33 n. 235, Ex. 152.
[230] *Id.* at 34–47.
[231] Civ. Dkt. 1971 at 1 (citing Civ. Dkts. 1916, 1965); Civ. Dkt. 1467 at 1.
[232] Hytera Sent. Mem. at 12, Dkt. 364.

asks this Court to allow it to pay Motorola ▮ million annually over the next five years, as part of a payment plan, to fulfill the remainder of its obligations. In the end, Motorola will reap many millions more than the $174 million it claims in lost profits courtesy of the $271.6 million punitive damages award.[233] And that $271.6 million punitive damages award is part of more than $600 million in damages, interest, costs, fees, and royalties that Hytera will pay in total to Motorola as a result of the civil litigation.[234]

Because Hytera will pay what it owes to Motorola, no more blood can or need be extracted from Hytera. It is time for this case and the parties' underlying legal feud to end.

Dated: November 16, 2025                          Respectfully submitted,

                                                  */s/ Rachel M. Cannon*

                                                  Rachel M. Cannon
                                                  Christopher S. Niewoehner
                                                  STEPTOE LLP
                                                  227 West Monroe Street, Ste. 4700
                                                  Chicago, IL 60606
                                                  Telephone: (312) 577-1300
                                                  rcannon@steptoe.com
                                                  cniewoehner@steptoe.com

                                                  Boyd Cloern (*pro hac vice*)
                                                  Scott Richey (*pro hac vice*)
                                                  STEPTOE LLP
                                                  1330 Connecticut Avenue NW
                                                  Washington, DC 20036
                                                  Telephone: (202) 429-3000
                                                  bcloern@steptoe.com
                                                  srichey@steptoe.com

---

[233] *Motorola Sols., Inc. v. Hytera Commc'ns Corp.*, 108 F.4th 458, 471 (7th Cir. 2024).

[234] Hytera Sent. Mem. at 46–47, Dkt. 364 (describing ▮ million in payments towards the civil judgment, a ▮ million remaining balance on the civil judgment); *id.* at 47 n. 227 ("[P]ost-judgment interest of approximately $4 million per year will continue to accrue (though less interest will accrue as payments are made)."); Qiao Decl. ¶¶ 43, 50, Dkt. 365-9 (describing a ▮ million non-H-Series royalty payment to Motorola in September 2023 and ▮ million in subsequent royalty payments).

**CERTIFICATE OF SERVICE**

I, Rachel M. Cannon, an attorney, hereby certify that on November 16, 2025, I caused a true and correct copy of the foregoing submission to be served via the Court's ECF system upon all counsel of record.

*/s/ Rachel M. Cannon*
Rachel M. Cannon

## CERTIFICATE OF SERVICE

I certify that on June 3, 2026, I caused a true and correct copy of the foregoing supplemental appendix to be served via the Court's ECF system upon all counsel of record. I also certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

/s/  Rachel M. Cannon

Rachel M. Cannon
(*Counsel of Record*)
STEPTOE LLP
(312) 577-1270
